**Donna ROLLER, Claimant–Appellant,**

v.

**TREASURER OF the STATE OF MISSOURI as Custodian of the Second Injury Fund, Respondent.**

No. 20986.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 8, 1996.

Motion for Rehearing or Transfer
Denied Dec. 3, 1996.

Stephen W. Nichols, Arthur H. Stoup & Associates, P.C., Kansas City, for claimant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cara Lee Harris, Asst. Atty. Gen., Jefferson City, for respondent.

SHRUM, Judge.

Claimant, Donna Roller, appeals from a final award entered by the Labor and Industrial Relations Commission (Commission) in her workers' compensation claim against the custodian of the Second Injury Fund (Respondent). The Commission concluded that "[t]he Fund has no liability." This award was based on the Commission's underlying finding that, although Claimant was permanently and totally disabled, such disability resulted from "the last accident, alone, and not from a combination of disabilities." On appeal, no one contests the Commission's finding that Claimant was permanently and totally disabled. Rather, the issues presented are: is the award supported by substantial and competent evidence, or if not totally unsupported, is it at least contrary to the overwhelming weight of the evidence? This court answers "yes" to the first question, "no" to the second. We affirm the award.

## PROCEDURAL BACKGROUND

Claimant injured her back on two separate occasions, the first time in 1980, and then while on the job in 1989. In March 1992, she settled her claim against that employer for a sum based on a disability of 40% of the body as a whole, leaving her claim against Respondent pending. A hearing on Claimant's pending claim against Respondent was held in front of an Administrative Law Judge, Robert House (ALJ), on July 19, 1995. On September 15, 1996, the ALJ entered an award finding Claimant to be permanently and totally disabled at the time of the hearing. Furthermore, the ALJ found that such disability was a result of the progression of the 1989 injury alone. However, the ALJ then found that Second Injury Fund liability should be determined by using the percentage of an employee's disability existing at the time the last injury was sustained. After finding that the disability resulting from Claimant's 1980 injury and from her 1989 injury had combined to create a disability 25% greater than that which would have

resulted from the last injury alone, the ALJ found Respondent liable for a sum based on Claimant's enhanced disability.

Claimant and Respondent both appealed the ALJ's decision to the Commission. The Commission entered a Final Award Denying Compensation on April 4, 1996. In its Final Award, the Commission agreed with the ALJ's finding that Claimant was permanently and totally disabled. The Commission also agreed with the ALJ's determination that Claimant's permanent total disability was attributable solely to the 1989 accident and was not a combination of disabilities sustained from the 1980 and 1989 accidents. However, the Commission found that the ALJ erred in his ruling that the overall disability from both the prior and last injury should be assessed at the time the last injury was sustained. The Commission declared that the prior disability is to be assessed at the time of the last injury, not the combined disability. This conclusion of law is not challenged on appeal. The Commission concluded that the finding that Claimant was permanently and totally disabled solely as a result of the 1989 accident was dispositive; that the employer would have been liable for such permanent and total disability had Claimant not settled her claim against her employer; and that in any event, Respondent was not liable. This appeal followed.

## DISCUSSION AND DECISION

Claimant presents two points relied on. In both points Claimant correctly asserts that in making its award the Commission relied upon the deposition testimony of Dr. Williams to determine that "[Claimant] is permanently and totally disabled as a result of the last accident, alone, and not from a combination of disabilities." Defendant maintains that Dr. Williams' testimony on the subject of what caused her permanent disability was so conflicting that it lacks probative value and is self-destructive, thereby leaving the award unsupported by substantial evidence (Point I), or if not totally unsupported, at least contrary to the overwhelming weight of all the evidence, which included contrary and conflicting opinions of other physicians (Point II).

As a prelude to our analysis of Claimant's specific arguments, we recount the following principles of law relating to Second Injury Fund liability and the scope of our review.

Section 287.220, RSMo 1994, creates the Second Injury Fund and provides when and what compensation shall be paid from the fund in "[a]ll cases of permanent disability where there has been previous disability." *See Stewart v. Johnson,* 398 S.W.2d 850, 852 (Mo.1966). Where, as in this case, a claimant is totally and permanently disabled, the legislature via § 287.220.1 fixed and limited an employer's liability to that part of the disability "resulting *from the last injury considered alone and of itself.*" *Id.* at 853. Likewise, the legislature fixed the liability, if any, of the Second Injury Fund by providing

> "that if the compensation for which the employer at the time of the last injury is liable *is less* than the compensation provided in this chapter for permanent total disability, then in addition to the compensation for which the employer is liable *and after* the completion of payment of the compensation by the employer, the employee shall be paid *the remainder* of the compensation ... [due for such disability] out of ... the 'Second Injury Fund'...."

*Id.* To give effect to the foregoing italicized words in § 287.220.1, the first question that must be answered is the degree of disability from the last injury. *Id.* at 854. "Until that disability is determined, it is not known whether the second injury fund has any liability...." *Id.*

In *Davis v. Research Medical Center,* 903 S.W.2d 557 (Mo.App.1995), the Western District, after an exhaustive analysis of the guidelines governing appellate review of issues of fact in a workers' compensation case, summarized its findings thusly:

> "[T]he standard of review of an award of the Commission is as follows. The reviewing court may not substitute its judgment on the evidence for that of the Commission. The weight of the evidence and the credibility of witnesses are ultimately for the Commission. The court applies a two-step process designed to determine whether the Commission could have reasonably

made its findings and award upon consideration of all the evidence before it. In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence. In doing so, it takes into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with those findings."

*Id.* at 571. We note further that *Davis* makes it clear that in the first step, the appellate court must disregard any evidence supporting any finding different from those made by the Commission. *Id.* at 566[5]. On the other hand, opposing, unfavorable evidence must be considered and may not be disregarded during the second step of the analysis. *Id.* at 566[7].

In addressing the two points raised on appeal by Claimant, we discuss those facts pertinent to the application of the *Davis* two-step standard of review.

■ Therefore, we first consider the evidence supporting the award in the light most favorable to the award, deferring our consideration of unfavorable evidence until the second step of the analysis. Claimant first injured her back in 1980 when she slipped on some ice on her front steps at home. Claimant sustained a ruptured disk at L4–5, which was treated surgically by a partial lumbar hemilaminectomy. Claimant missed two weeks of work due to her injury, and was released by her doctor without any physical restrictions shortly thereafter. Although Claimant had discomfort from time to time, which she treated solely with over-the-counter medication, she did not see a physician between May 1980 when her physician released her and August 1989 when she injured her back a second time.

In the period between the two injuries, Claimant held a number of different jobs. One category of jobs could be generally described as clerical, which Claimant had no difficulty performing with accommodations for filing and heavy lifting. The other category was cross-country truck driving. Claimant rode with her husband for a brief time in between two of the clerical jobs, and then in 1988 she attended truck driving school, passed a Department of Transportation physical, and began team driving with her husband.

In August 1989, Claimant injured her back in the course of her employment when she slipped while exiting a truck. As Claimant described the injury, she was holding the door handle when her foot slipped off the top step. Claimant said that she hit the ground on her feet, twisting her arm and pulling her upper back. According to Claimant, this resulted in immediate sharp pain in her lower back and arm. Following the injury, Claimant began to experience pain in her left hip and leg, and she stayed home for three weeks in hopes that the pain would go away. When the pain did not subside, Claimant saw Dr. Daniel Stough. An MRI revealed a midline disc bulge at L3–4, degeneration at L4–5 (the site of the first injury), and a herniated disc at L5–S1. Upon seeking a second opinion from Dr. Michael Williams, Drs. Williams and Stough operated on Claimant's back in January 1990, performing a lumbar laminectomy with disc excision at L3–4; a Gill procedure with complete laminectomy at L–5; a fusion at L3–S1 using an iliac crest bone graft; and installing a Knodt rod instrumentation and segmental wiring at L3–S1.

Following the surgery, Claimant took several months of bed rest, and then began physical therapy in September 1990. Dr. Williams ultimately released Claimant to re-

turn to work in March 1991. She did so, driving a school bus from August 1991 to May 1993.

Prior to her August 1989 injury, Claimant was able to sit for considerably longer than the one hour to which she is currently limited. Likewise, she could lift up to thirty pounds prior to August 1989, while she can only lift ten pounds now.

Dr. Williams, one of the two surgeons who performed the January 1990 operation, rated Claimant's permanent partial impairment to the body as a whole at 55% in March 1991. In October 1991, Dr. Williams clarified this rating, stating that it was his opinion at the time that 15% of the 55% was attributable to the 1980 injury, while 40% was attributable to the 1989 injury. Presumably, Claimant relied on that rating when she settled her claim against her employer in March 1992.

After releasing Claimant in March 1991, Dr. Williams next saw Claimant in August 1993. His testimony, from a deposition taken in January 1995, reflects a change in his assessment of her in that he then concluded that Claimant's disability had progressed to the point where she was totally and permanently disabled. Dr. Williams' testimony attributed Claimant's now total disability to the 1989 injury:

"Q In your opinion, based on reasonable medical certainty, was any portion of the progression related to the condition you diagnosed as having preexisted the August '89 accident? Was any portion of the progression related to that?

"A I don't feel that it was because she had a nine year history of really having minimal problems following that first laminectomy. She did very well for nine years until she fell and had the injury of 1989, and done as well from lumbar laminectomy as anyone can."

When the issue of which injury or injuries caused Claimant's total disability was put to Dr. Williams, he answered unequivocally:

"Q In your opinion, based on reasonable medical certainty, absent the preexisting condition you diagnosed as resulting in the 15 percent, would the conditions resulting from the August '89 injury alone by

themselves resulted in permanent total disability?

"A It can, yes. I think it has in this case."

Dr. Williams' testimony also reveals his opinion of the cause of Claimant's disability:

"Q What has progressed and made her significantly worse off since the fusion and the surgery is the scar tissue from the surgery that was done in 1990; is that right?

"A I feel that way, yes."

Clearly, based on our consideration of the whole record, it contained sufficient competent and substantial evidence to support the award. We deny Point I based on the foregoing.

■ Coincidentally, as was the case in *Davis,* while Claimant's first point relied on is phrased in terms of the award being unsupported by sufficient, competent, and substantial evidence, much of the argument which follows it is actually attempting to persuade us that the award was against the overwhelming weight of the evidence. Thus, we have deferred our consideration of the evidence which, according to Claimant, opposes the finding of the Commission, since we must disregard this evidence in the first step of the *Davis* analysis. Such argument should have been presented in Point II, where Claimant argues that the overwhelming evidence indicated that her total permanent disability was a result of the combined disabling effects of the 1980 and 1989 injuries, rather than the 1989 injury alone. Since Point II questions whether the award was against the overwhelming weight of the evidence, we now proceed to the second step of the *Davis* analysis.

*Evidence of Prior Disability*

The first evidence Claimant points to in the argument portion of her brief concerns the seriousness of her 1980 injury, the accompanying surgery, and the difficulties she had in performing her work after that injury. Such a prior partial disability is completely irrelevant where a claimant is totally disabled by the second injury alone, as Respondent contends. Moreover, Dr. Williams

testified that the L3–S1 fusion which he performed in Claimant's 1990 surgery would have been necessary as a result of the 1989 injury even without the prior injury and surgery. Dr. Williams was not the only doctor whose medical opinion was before the ALJ and the Commission. Claimant offered the deposition testimony of Dr. Harry Overesch, and at one point in his testimony, Dr. Overesch unreservedly agreed with Dr. Williams' assessment:

"Q. Dr. Williams testified that despite what findings would have been made at L4–L5, and if she had had surgery there before or not, he would have gone ahead with the fusion from L3 all the way to S1. Do you believe that that is something you would have agreed with?

"A. I would think so."

However, Dr. Overesch later wavered on this issue, backtracking to a position that Claimant might not have needed a fusion all the way up to L3–4, but still seemed to simultaneously sympathize and agree with Dr. Williams' goal of giving Claimant as much stability as possible by fusing her up to that level.

Claimant returns to this foregoing theme of the significance of her prior disability when she takes issue with the ALJ's credibility determination that:

"because claimant had no difficulties between 1980 and 1989 that required any medical attention or resulted in any progression of symptoms serious enough to limit her work activities, the reasoning of Dr. Williams is more persuasive in finding that the continuing progression of claimant's problems following her 1989 injury alone is the cause of her permanent total disability."

Claimant asserts that this finding is contradicted by the ALJ's finding that she had limitations in the performance of her work following the 1980 fall. The value of attempting to point out contradictions in the ALJ's findings is dubious at best, since we are to review the findings of the Commission, not the ALJ. *See Gordon v. Tri–State Motor Transit Co.*, 908 S.W.2d 849, 852[2] (Mo. App.1995). At any rate, it is not contradictory to say that one has limitations as a result of an injury *and* that there has been no progression of symptoms from that injury which have led to any further limitations. Moreover, throughout her brief, Claimant expends considerable effort attempting to convince this court that she had a prior disability. Yet, this fact is uncontradicted and has no bearing on the question of whether the 1989 injury alone caused Claimant to become totally and permanently disabled.

*Chronic Arachnoiditis as a Pre-existing Condition*

Claimant next points to Dr. Overesch's opinion that chronic arachnoiditis, or intense scarring below the dural covering in the arachnoid covering, is the cause of her permanent and total disability. In fact, Dr. Williams' testimony is in agreement with Dr. Overesch's diagnosis. However, Claimant argues that "it is well known that chronic arachnoiditis can be a progressive condition" and relies on Dr. Overesch's 1995 opinion that Claimant's chronic arachnoiditis resulted from her combined injuries. Be that as it may, Dr. Overesch did not believe that Claimant suffered from chronic arachnoiditis when he saw her in November 1990, and he admitted in his deposition that any chronic arachnoiditis which would have resulted from the 1980 surgery would have manifested itself well before 1989. The ALJ's credibility determination that Dr. Overesch "second guessed" himself is apt and the evidence justifies the ALJ's and Commission's acceptance of Dr. Williams' opinion that the scarring which has totally disabled Claimant is a result of the 1990 surgery alone. While Claimant labels this "notion" as "incredible," such a protestation arises solely from Claimant's mischaracterization of several pages of Dr. Overesch's testimony. Specifically, she misconstrues testimony concerning the combined disabling effect of the 1980 and 1989 injuries as an opinion that various pre–1989 conditions led to the development of chronic arachnoiditis. That characterization is not supported by the record. Not surprisingly, this mischaracterization also spawned a related argument that it was "preposterous" to conclude that chronic arachnoiditis developed solely from the herniated L3–4 disc resulting from the 1989 injury. This argument com-

pletely ignores the other herniated disc at L5–S1 sustained in the 1989 fall as well as the above testimony that the 1989 injury necessitated a fusion all the way from L3 to S1.

*Spondylolisthesis as a Pre-existing Condition*

■ Claimant next turns to a series of "contradictions" in Dr. Williams' testimony. Claimant makes much of the fact that Dr. Williams testified that spondylolisthesis was a pre-existing condition and that "the bulk of the problem that she is having is attributable to really progression of her symptoms from the 3–4 disk rupture and the spondylolisthesis." However, the uncontradicted testimony of Dr. Williams was that the spondylolisthesis was asymptomatic prior to the 1989 injury,[1] which aggravated it to the point where it did become symptomatic. A pre-existing condition does not affect Claimant's employer's liability, for "[a] pre-existing but non-disabling condition does not bar recovery under the Workers' Compensation Law if a work related accident causes the condition to escalate to the level of disability." *Weinbauer v. Grey Eagle Distrib.*, 661 S.W.2d 652, 654 (Mo.App.1983).

*Degenerative Changes from the 1980 Injury*

Another "contradiction" in Dr. Williams' testimony with which Claimant takes issue occurred in this exchange:

"Q In your opinion, based on reasonable medical certainty, did [Claimant] have some progression of the condition she had from 1980 and from 1989?

"A. I think her condition from 1980, she had *very mild progression* of degenerative changes from 1980 to 1989. Once you have a solid fusion, those degenerative changes are not going to progress because there is no motion. So I really feel that the degenerative changes that were there when I first saw her in 1989 are no worse now.

"However, the scarring from the surgery and from the injury in 1989, I feel that that has progressed and that is worse.

Since she had had *no progression* of her symptoms between 1980 and 1989 prior to that 1989 accident or injury, I have no reason to suspect that the 4–5 disk from 1980 is causing any of her pain now." (emphasis suggested by Claimant). Claimant boldly suggests that Dr. Williams has completely contradicted himself when he states first that "she had *very mild progression* of degenerative changes from 1980 to 1989" and then goes on to state that "she had had *no progression* of her symptoms between 1980 and 1989 prior to that 1989 accident or injury[.]" Obviously, degenerative changes do not necessarily cause symptoms, and Claimant's assertion that this testimony is contradictory is simply erroneous.

*Dr. Williams' Change of Opinion*

Claimant rightly points out that Dr. Williams did not render a consistent opinion as to whether the 1980 and 1989 injuries combined to cause her total permanent disability. As we have previously noted, in his deposition taken January 24, 1995, Dr. Williams unequivocally attributed Claimant's total permanent disability solely to the 1989 injury. In that same deposition, Dr. Williams had previously stated that opinion in less authoritative terms, attributing the "bulk" of her progression towards total disability to the 1989 injury. Moreover, in a report dated March 21, 1994, Dr. Williams stated:

"I believe that her two separate back injuries, the one which pre-existed August '89 which resulted in 15% permanent/partial disability, and the injury stemming from the August '89 accident which resulted in 40% permanent/partial disability, combined synergistically so that the combined effect of the two injuries exceeds the simple arithmetic sum of the two injuries to render [Claimant] permanently and totally disabled."

The ALJ was acutely aware of this contradiction, addressing it in his award: "[I]n his March 21, 1994, report, Dr. Williams found a combined effect of the 1980 and 1989 injuries

---

1. Although Claimant asserts in her reply brief that this issue was contested, her assertion is unsupported by citation to the record and our review of the whole record discloses no such contrary view.

to result in permanent and total disability. Nevertheless, he opined in his deposition that the progression of the 1989 injury alone caused permanent and total disability in this case." In our section entitled *Evidence of Prior Disability,* we excerpted the ALJ's award where he made the credibility determination that Dr. Williams' reasoning was more persuasive than Dr. Overesch's on the question of whether Claimant's 1980 injury had a combined effect with the 1989 injury. The ALJ was bothered by conflicts in both doctors' testimony, noting that Dr. Overesch had "second guessed" his opinion between 1991 and 1995. The ALJ was particularly bothered by two changes of opinion made by Dr. Overesch:

"Following his 1995 review Dr. Overesch changed his opinion that claimant's development of 'chronic arachnoiditis' was a result of her combined injuries. That was not his opinion in his examination in 1991. In 1995 he additionally found claimant to be permanently and totally disabled [whereas he had previously found her to be partially disabled]."

The overall effect of the testimony of both doctors is apparent in the ALJ's concluding paragraph: "I have difficulty with Dr. Overesch's ultimate conclusion [that the 1980 and 1989 injuries had a combined effect].... I also have difficulty with Dr. Williams' March 21, 1994, report in light of his deposition testimony."

■ Obviously, the ALJ made a credibility determination that the conflicted testimony of Dr. Williams was more credible than the conflicted testimony of Dr. Overesch. These credibility determinations were undisturbed by the Commission, which addressed the subject by saying only that:

"The administrative law judge determined that the claimant's worsening condition was attributable to the last accident and not to a combination of the disabilities sustained from the preexisting and last accident. This was based on the credible testimony of Dr. Williams, who had observed the claimant over a period of time and had the opportunity to rate the claimant on two different occasions."

With the exception of the Commission's reversal of the ALJ's award of permanent partial disability benefits, an issue not raised by Claimant, the Commission affirmed the findings of the ALJ in all other respects. The resulting consistency between the ALJ's credibility determinations and the Commission's, both of which determined the credibility of the physicians from a written record, is a factor in favor of upholding the Commission's award on appeal. *See Davis,* 903 S.W.2d at 571 (observing the power of such consistency where the ALJ heard live testimony and the Commission had not). Of course, our review is of the Commission's credibility determinations since they were the same, in an implicit sense, as those of the ALJ. To that end, we recognize that the Commission can, within the framework of our standard of review, reject the testimony of one doctor in favor of another. *Hutchinson v. Tri–State Motor Transit Co.,* 721 S.W.2d 158, 162–63[4] (Mo.App.1986). Given that, upon consideration of all the evidence in the record, we cannot say that Dr. Williams' change of opinion is a basis for disturbing the Commission's decision that his testimony was more credible than Dr. Overesch's.

Certainly, given the conflicting opinions and the waffling of the two doctors who testified in this case, there would have been sufficient evidence to support either the conclusion that Claimant urges or the conclusion that the Commission made. However, our inquiry is restricted to whether, upon consideration of all evidence in the record and its overall effect, the Commission's Final Award Denying Compensation was against the overwhelming weight of the evidence. We conclude that it was not. Point II is denied.

We affirm the Final Award Denying Compensation.

CROW, P.J., and MONTGOMERY, C.J., concur.